392 P.2d 695

**Ralph A. JACKSON, Plaintiff-Appellant,**

v.

**STATE of Idaho, Defendant-Respondent.**

No. 9383.

Supreme Court of Idaho.
May 22, 1964.

Rehearing Denied June 17, 1964.

Allen R. Derr, Boise, for appellant.

Allan G. Shepard, Atty. Gen., and Stephen W. Boller, Asst. Atty. Gen., Boise, for respondent.

TAYLOR, Justice.

December 18, 1962, appellant (plaintiff), an inmate of the state penitentiary, filed in the district court, in and for Ada county, a petition for writ of habeas corpus. In his petition he alleged that his imprisonment was illegal in that the judgment of conviction and commitment was void because he had been "deprived of his right to be represented by counsel," and that upon his arraignment he had not been advised of his "right to counsel or of the nature of the charges against him," and that because of illness, injury and emotional disturbance he was at the time "wholly incompetent and incapable of representing himself and incapable of intelligently and competently waiving his right to counsel."

The writ was issued and after hearing upon the return thereto, the court made and entered findings, conclusions and judgment quashing the writ and remanding petitioner to the custody of the warden of the penitentiary.

On the evening of March 16, 1960, appellant was arrested by the sheriff of Idaho county upon a charge of murder, arising out of the slaying of his wife. At 9:15 a. m. on the 17th day of March, 1960, appellant was taken before a magistrate, at Grangeville, the county seat. The order of the magistrate holding the accused to answer the charge in the district court recites:

"* * * at that time he was given a copy of the Complaint and a copy of the Warrant and allowed to read the same. After having read the same he was asked whether he had read the same and understood the charge and he informed the Court that he had and did. And at that time he was informed that he had the right to the aid of counsel at every stage of the proceedings and that he could secure counsel immediately or at any time thereafter, and that he had a right to a preliminary examination and such preliminary examination was explained to him.

"That the said Ralph Jackson was accompanied by Bud Taylor in his appearance before me, and having appeared before me and having been informed of his rights, he was then duly arraigned upon the charge stated in the foregoing Complaint, namely, of Murder in the First Degree, and thereupon the said Ralph Jackson waived his right to counsel and his right to a preliminary examination by personally informing and stating to the Court that he did not desire to be represented by counsel at this stage of the proceedings and that he did not desire to have a preliminary examination upon the charge stated in the said Complaint."

Concerning appellant's condition on the. morning of his appearance before the magistrate, the prosecuting attorney testified that there was a bump or swelling on his head, some scratches on his face, and further:

"Q   Were there any other noticeable bruises or noticeable contusions of his body?

"A   His fists were swollen and there were marks—lacerations which appeared to be teeth marks on the left hand—there was what appeared to be quite obviously an imprint of teeth.

"Q   Did the defendant appear to be in shock?

"A   No, sir.

"Q   Did he appear to be intoxicated?

"A   No, let me say this, he did not appear to be intoxicated, he appeared—his eyes were blood shot, he appeared to me to be a man who had done heavy drinking and was recovering from the effects of the same.

"Q   You would not say then that he was intoxicated at the time of your appearance?

"A   No, I am sure.

"Q   Did he seem to be comprehensive?

"A   I believe so.

"Q   You feel he comprehended what was going on?

"A   I think so."

On both the 17th and 18th of March appellant repeatedly advised the sheriff and prosecuting attorney that he did not wish to consult an attorney; that he wanted to plead guilty forthwith and "get it over with." He also told the officers that he did not mean to kill his wife in the encounter with her on the evening of the 16th. The prosecuting attorney, sheriff, deputy sheriff, and coroner went to appellant's house and there examined the scene of the crime and interviewed neighbors.

On the morning of the 18th, the sheriff called the prosecuting attorney and advised him that the appellant wanted to plead guilty and asked when the case could be taken care of. The prosecutor advised that the district judge would not be in Grangeville for at least two weeks, but that if appellant wanted earlier action he would undertake to arrange with the judge for the appellant to appear in chambers at Lewiston, provided that the appellant would make application for that purpose. The sheriff further advised the prosecutor that appellant asserted he did not mean to kill his wife and questioned whether or not he should be charged with first degree murder. The prosecutor responded that from the investigation he and other officers had made at the Jackson home, it appeared that

the deceased had been killed in a drunken brawl, and that under such circumstances he might feel it proper to move to reduce the charge to murder of the second degree, for want of the element of premeditation. These facts and circumstances were relayed by the prosecuting attorney to the district judge by phone and the judge informed the prosecutor that he could bring the appellant to his chambers at Lewiston, and that a motion to reduce the charge could be heard at that time. The prosecutor then went to the sheriff's office and, in the presence of the sheriff and others, talked to the appellant. At that time he informed Jackson that he was entitled to an attorney; that he need not go to Lewiston to plead to the charge; but if he wanted to go to Lewiston, he, the prosecutor, would prepare an application for that purpose; otherwise the appellant would wait until the judge came to Grangeville. The appellant again responded that he did not want counsel, but wanted to enter his plea. On this same occasion he inquired of the prosecutor what the penalty might be if the charge were reduced to second degree; to which the prosecutor responded that he could not give him any assurance as to the penalty because he did not know what the judge would do. The prosecutor then prepared, and the appellant signed, application as follows:

"I, the undersigned, hereby make voluntary application to be taken before the Judge of the District Court of the Tenth Judicial District of the State of Idaho, in and for the County of Idaho, at his chambers, then and there to enter before said Judge, my plea of GUILTY to the charge of Murder in the Second Degree, and I hereby admit that I did murder my wife, but that I did not do so with any premeditation, and I have requested and asked the Prosecuting Attorney if I may enter a plea of GUILTY to Murder in the Second Degree in the above entitled case and he has informed me that Murder in the Second Degree is an included charge in the Information on file against me and, therefore, I hereby admit that I am GUILTY of Murder in the Second Degree in the above entitled case and request the Judge, upon my entering a plea of GUILTY to said charge of Murder in the Second Degree, pass sentence upon me therefore forthwith."

The prosecuting attorney also testified that during these discussions Jackson appeared to understand fully the nature of the charge and related subjects being considered.

When the appellant was presented to the district judge at Lewiston, the judge inquired of the prosecutor if he had a motion to present; to which the prosecutor responded that he desired to move the reduction of the charge from first to second degree murder and then stated to the court his reasons for so doing. The court then

requested the prosecutor to reduce the motion to writing. The prosecutor then left the courtroom and prepared the motion, which among other things recites the following as reasons for the motion:

"1. That the defendant has admitted that he did murder his wife, Zella Jackson, but that he did not do so with any premeditation or planning and that he is willing to enter a plea of guilty to murder in the second degree.

"2. That an investigation subsequent to the filing of the original complaint in this matter and of the information consisting of further questioning of witnesses acquainted with facts surrounding the circumstances of the case and after a personal investigation by the prosecuting attorney of the premises and the scene of the murder, the said prosecuting attorney and the other investigating officers are now convinced that the crime lacked the requisite premeditation necessary to sustain a charge of first degree murder."

The motion was then presented to, and granted by, the court. Thereafter the arraignment, as transcribed by the reporter, took place, to wit:

"THE COURT: The defendant will stand up. You were charged with the crime of Murder in the First Degree which on motion of the Prosecuting Attorney and order of the Court has been reduced to Murder in the Second Degree under the name of Ralph Jackson. Is that your true name?

"MR. JACKSON: Yes, Sir.

"THE COURT: Do you have an attorney?

"MR. JACKSON: No, Sir. No.

"THE COURT: Do you want an attorney?

"MR. JACKSON: No.

"THE COURT: Then you will listen to the reading of the information.

"(Information read by Wayne C. MacGregor, Prosecuting Attorney).

"THE COURT: To this Information what is your plea, guilty or not guilty?

"MR. JACKSON: Plead guilty.

"THE COURT: The Court in this case, in order to fix sentence, wants a pre-sentence investigation. Certain representations have been made to the Court by the Prosecutor but I would like it reduced to writing for—and a full investigation had. In the meantime you are recommitted to the custody of the sheriff. You may take him.

"THE COURT: You can take the file and prepare an order and also a minute entry."

The reporter did not record all of the proceedings. The prosecuting attorney testified that he, with the appellant and the sheriff, was in attendance upon the court at chambers for a total of one and one-half hours, of which he (the prosecutor) spent about thirty minutes preparing the motion to reduce the charge. What occurred in the courtroom prior to his leaving to prepare the motion, and upon the presentation and ruling on the motion prior to the actual arraignment, were not recorded by the reporter. However, additional proceedings were had and are set out in both the "Minute Entry" and "Order", which were signed by the district judge under date of March 18, 1960. The minute entry recites:

"This matter having come on for hearing in Chambers at Lewiston, Idaho, upon application of the defendant, RALPH JACKSON, to be taken before the District Judge of the Tenth Judicial District of the State of Idaho, in and for the County of Idaho, to enter his plea of GUILTY to a charge of Murder in the Second Degree; and the Prosecuting Attorney of Idaho County, State of Idaho, W. C. MacGregor, Jr., having appeared before the Court at this time and moved the Court for an

Order reducing the charge on file in the above entitled matter from one of Murder in the First Degree to Murder in the Second Degree; and good cause appearing therefore, it was so ordered. Whereupon the Information was then read by the said Prosecuting Attorney to the defendant with the substitution in each instance of the words, 'Murder in the Second Degree' where the words 'Murder in the First Degree' appeared in said Information; and the Court having requested of the defendant whether his true and correct name was RALPH JACKSON; and he having answered that it was; and having again stated to the Court that he desired at this time to enter a plea of GUILTY to the charge of Murder in the Second Degree; and the said defendant having waived all his rights in conflict with his request to enter a plea of GUILTY to Murder in the Second Degree by being taken before the District Judge in his Chambers at Lewiston, Idaho; and the said defendant having been informed of his rights, including his right to counsel; and having waived his right to counsel; and having informed the Court that he did not desire the Court to appoint him counsel [,] to counsel, advise with and represent him in this action; and the Information, as amended, having been read to the defendant; and the

defendant having informed the Court that he had received a copy of the Information and that he understood that the charge had now been reduced to one of Murder in the Second Degree; and the defendant having requested that he be permitted to enter a plea to the charge of Murder in the Second Degree forthwith; and having waived time in which to consider his plea; and the said defendant having stated to the Court that he had murdered his wife, but without premeditation, and that he was guilty of Murder in the Second Degree; and the defendant thereupon did plead GUILTY to the crime of Murder in the Second Degree; and it appearing to the Court that this was a proper case in which to obtain a pre-sentence investigation and report prior to the pronouncement of judgment, the Idaho Board of Correction was thereupon requested to investigate said matter and submit a report and recommendation to the Court as to the disposition of said case. And thereupon the defendant was committed to the Sheriff of the County of Idaho, State of Idaho, until further order of the Court."

■ The court reporter's notes are only a part of the minutes of the court, First Nat'l Bank of Pocatello v. Poling, 42 Idaho 636, 248 P. 19, and an absence of reporter's notes, or an omission therefrom, cannot be taken to indicate that proceedings not recorded by the reporter were not in fact had.

In First Nat'l Bank of Pocatello v. Poling, supra, this court said, "The reporter's notes are the record of certain of the proceedings on the trial of the cause, but do not ordinarily constitute the court minutes proper. * * * We must look to the entries made by the clerk and consider them as evidence of what occurred in court." The statute makes the transcript certified by the reporter "prima facie" minutes only. I.C. § 1–1105. Minute entries made by the clerk of the court or by the judge himself, as in this instance, are conclusive of the proceedings so recorded. An order signed and entered by the judge is of a higher dignity than the notes of the clerk or reporter, and controls where there is a conflict. Campbell v. Timmerman, 139 Ill.App. 151; Mortimer v. Pac. States Sav. & Loan Co., 62 Nev. 142, 145 P.2d 733; Gould v. Austin, 52 Wash. 457, 100 P. 1029; McFadden v. McFadden, 22 Ariz. 246, 196 P. 452.

■ The district court is a court of record and its records imports verity. Pac. Finance Corp. of Cal. v. LaMonte, 64 Idaho 438, 133 P.2d 921; Burleigh v. Raines (Okl. Cr.) 359 P.2d 340; In re Hill's Estate, 149 Cal.App.2d 779, 309 P.2d 39; In re Gregory (Okl.Cr.) 291 P.2d 832; Wilson v. Los Angeles County Employees Assn., 127 Cal.

App.2d 285, 273 P.2d 824; Wyman v. Municipal Ct., 102 Cal.App.2d 738, 228 P.2d 89; Shellhaas v. Petrolane, 98 Cal.App.2d 171, 219 P.2d 797; Govea v. Superior Court, 26 Cal.App.2d 27, 78 P.2d 433.

"The truth of the record concerning matters within the jurisdiction of the court cannot be disputed." Cole v. Richmond, 156 La. 262, 100 So. 419, 423.

"Judicial records are memorials * * * of the proceedings or acts of courts of justice. They are of such uncontrollable solemnity and verity that they admit of no averment, plea, or proof to the contrary. They are memorials of the end of strife when the dispute has been settled by the judgment of the court. Such is the description of Lord Coke. It has been well and repeatedly said by the greatest judges of the greatest courts that, if the rule and law were otherwise, there would be difficulty to see where litigation would end." State ex rel. Whatley v. Brewer, 19 Ala.App. 291, 97 So. 160, 161.

In Application of Allen, 31 Idaho 295, 300, 170 P. 921, this court quoted from Hanley v. State, 50 Fla. 82, 39 So. 149, 150, " '[t]he entries contained in the record proper of a trial import verity, and they cannot be questioned on *habeas corpus*.' " In the Allen case the court held the habeas corpus proceedings to be a collateral attack upon the judgment.

In this case there is no conflict between the record as made by the court reporter and that made by the district judge. The foregoing authorities are cited in support of the proposition that this court cannot ignore the most authentic and important part of the record of what occurred in the district court, and base a decision upon the failure of the court reporter to report all the proceedings had. On direct examination the reporter testified:

"Q Are these notes complete notes of what transpired that day to the best of your recollection?

"A The part I took, they are."

and on cross-examination he testified that there may have been proceedings in chambers and possibly also in the courtroom when he was not present. He made no pretense of having reported all of the proceedings had in the matter of appellant's arraignment.

■ Moreover, where there is an omission or want of detail in the minutes of the court in proceedings provided for by statute, in the absence of a statutory provision specifically requiring that such proceedings be entered upon the minutes, the law presumes that the proceedings were regular and that the statute was complied with. And the burden is upon one who asserts the

law was not complied with, to show that fact, and that he was prejudiced thereby.

"All the presumptions are in favor of the regularity of the proceedings of courts of record. In the absence of any showing to establish the fact whether the court did or did not comply with these requirements of law, the presumption of law will at once arise that the court complied therewith and discharged every duty the statute imposed upon it in the trial of the case." State v. Suttles, 13 Idaho 88, 92, 88 P. 238, 239.

"While * * * [the statute] requires the indictment or information in a felony case to be read and the plea to be stated to the jury, there is no statute expressly requiring a record to be kept of it and, in the absence of a specific statutory requirement directing that such fact be recorded, the presumption is, when the record is silent upon the point, that the proceedings were regular, and that the law was complied with." State v. Lottridge, 29 Idaho 53, 59, 155 P. 487, 488.

See also: State v. Dawson, 40 Idaho 495, 235 P. 326; State v. Arnold, 39 Idaho 589, 595, 229 P. 748; State v. Chacon, 37 Idaho 442, 448, 216 P. 725.

The record of appellant's arraignment, both before the magistrate and before the district judge, parallels that of the petitioner in Cobas v. Clapp, 79 Idaho 419, 425, 319 P.2d 475, 477, cert. den. 356 U.S. 941, 78 S.Ct. 785, 2 L.Ed.2d 816. That decision is authority for affirming the judgment herein. What we said in that case is applicable here:

"We have examined the entire record and are unable to find any errors, either of commission or omission, in the proceedings had or taken against appellant, which resulted in his imprisonment, nor were any of his constitutional rights or laws enacted for his protection violated in any particular, nor did anything occur that would deprive the district judge of jurisdiction. Even if there were procedural errors, the same could not now be reviewed in a habeas corpus proceeding.

"The general rule is habeas corpus cannot be resorted to or employed as an appellate remedy or for the purpose of reviewing or correcting errors in the trial, and is not available as a substitute for an appeal or other revisory remedy. (Citations.)" 79 Idaho at 425, 319 P.2d at 477.

In re Blades, 59 Idaho 682, 86 P.2d 737, was written upon an appeal by the state from an order discharging the petitioner in habeas corpus proceedings. The court there held such proceedings to be a collateral remedy and a collateral assault upon the

judgment of conviction. The writ had been prosecuted upon the ground that petitioner was convicted by a jury, among the membership of which was one who was disqualified, he being an "unpardoned felon" ; that as a result petitioner had been convicted by a jury of eleven, and his constitutional right of trial by jury had been denied. In holding this contention to be without merit, the court said:

"The general doctrine has been announced in this state that *habeas corpus* is a collateral remedy, and an assault upon the judgment, and where nothing to the contrary appears in the record it will be conclusively presumed that the court had full jurisdiction, and that all proceedings were regular. Entries in the record of a court of general jurisdiction import verity, and cannot be questioned on *habeas corpus.*" In re Blades, 59 Idaho 682, at 686, 86 P.2d 737, at 738.

Ex Parte Connor, 16 Cal.2d 701, 108 P.2d 10, app. dis. and cert. den., 313 U.S. 542, 85 L.Ed. 1510, 61 S.Ct. 844, was an original habeas corpus proceeding in the supreme court of California, by which petitioner sought to obtain his release from prison on the ground that "the court failed to inform him of his right to counsel, or to appoint counsel to defend him, or to allow him a sufficient opportunity to procure legal assistance, * * *." The record made on the petitioner's preliminary arraignment showed that the court informed defendant of his "right to the aid of counsel in every stage of the proceedings." In the superior court, upon arraignment, he was asked if he had an attorney and answered, "I don't need any ; " and asked if he wanted to represent himself, replied, "It don't make any difference to me. Go ahead." The court proceeded with the trial. Concerning such record, the court said:

"There is nothing in these facts, or in the method shown to have been employed in preparing the record, or in any other matter brought out by petitioner, which would cast a doubt upon the verity and authenticity of the docket entry stating that petitioner was duly informed of his right to counsel. The presumption is that in preparing the record, official duty was regularly performed. Code Civ.Proc., sec. 1963, subd. 15. The record imports absolute verity, and in this collateral proceeding must be accepted as speaking the truth. Halpern v. Superior Court, 190 Cal. 384, 212 P. 916; People v. Figueroa, 134 Cal. 159, 66 P. 202; Govea v. Superior Court, 26 Cal.App. 2d 27, 78 P.2d 433. It is therefore of itself sufficient to refute petitioner's claim that he was then denied his constitutional right with respect to the aid of counsel." Ex Parte Connor (Cal.) 108 P.2d 10, at 14.

The court then held that in view of the petitioner's criminal record, he was familiar with court procedure and that he had intelligently and competently waived his constitutional and statutory right to counsel.

In re Chester, 52 Cal.2d 87, 338 P.2d 431, is the report of an original habeas corpus proceeding in the supreme court of California, in which the petitioner sought release from prison, contending that his imprisonment was illegal because he had not been advised that the court would appoint counsel for him if he were unable to employ counsel for himself. The issues were heard before a referee appointed by the court. The minute entry in the magistrate's docket showed that defendant was "informed of all his legal rights, including * * * his right to counsel at all stages of the proceedings." The petitioner testified that he had been advised of his "right to *hire* an attorney." Apparently there was no record of the arraignment in superior court. Three witnesses, including the judge who conducted the arraignment, testified that it was the custom of the judge to inquire whether the defendant had counsel and of his right to have counsel appointed for him if he were without means to engage his own counsel. Based upon this evidence, the referee made a finding that the petitioner was so advised. The supreme court found such evidence sufficient to support the referee's finding. In denying the petition and upholding the judgment the court said:

"In a habeas corpus proceeding, after judgment, based on an alleged denial of the right to counsel, the court record of the proceedings on arraignment creates a presumption of verity. * * *

"Since the record discloses (i) that petitioner was informed of his right to have counsel appointed to represent him when he was arraigned in the superior court and (ii) that he waived his right to counsel at the time of his arraignment, it is clear that he has not met the burden of proof resting upon him with respect to his claim that he was denied the right to counsel." 338 P.2d at 432–433.

In People v. Clarke, 168 Cal.App.2d 342, 335 P.2d 775, the defendant appealed from a judgment convicting him of second degree burglary. The court noted that the record disclosed the appellant had been

"informed of his right to counsel which he refused; that the information was read to him; that he entered a plea of guilty to the charge; that he was told of his right to a jury trial; that he was asked a second time if he wished to enter a plea of guilty; that he answered yes; and that the court accepted his plea."

In upholding the conviction the court said:

"A plea of guilty is an admission of defendant's guilt and of every element of the offense charged and the degree of the crime. People v. Mendietta, 101 Cal.App.2d 788, 226 P.2d 34."

In the light of the foregoing authorities, the record in the instant case is conclusive that the conviction and commitment of appellant is valid and that no constitutional or statutory right was denied him. The minute entry and order, showing that appellant "informed the court that he did not desire the court to appoint him counsel," is sufficient to show that he was informed that the court would appoint counsel if he were unable to employ one himself. Else, what reason would appellant have to inform the court that he did not desire the court to appoint counsel if he had not been advised that the court would do so if he did so desire? Moreover, any deficiency in the minute entries, under the authorities of this court above cited, is supplied by the presumption that the court complied with the statute.

■ The authorities uniformly hold that the burden is on the petitioner in habeas corpus proceedings to establish the illegality of his detention. In re Martz, 83 Idaho 72, 357 P.2d 940; 39 C.J.S. Habeas Corpus § 100 a.; 25 Am.Jur., Habeas Corpus, § 150. In this appellant has wholly failed.

Following the arraignment and plea, the court fixed time for pronouncing judgment and judgment was entered on the 8th day of April, 1960, in open court at Grangeville.

The requested presentence investigation was made by the State Board of Corrections and a report of its findings was made to and considered by the district judge, prior to the pronouncing of judgment. The judgment recites:

"And the defendant having appeared before this Court at said time, and the Court having given due consideration to the presentence investigation report, and the Court being fully advised in the premises; and the defendant having again reiterated his plea of guilty, and there appearing to be no cause why sentence should not [be] now pronounced, the defendant, RALPH JACKSON, *was duly informed of the nature of the Information filed against him of the crime of Murder in the Second Degree,* committed on or about the 16th day of March, 1960, of his arraignment, and his plea of guilty as charged in said Information, the defendant, RALPH JACKSON, was then asked if he had any legal cause to show why judgment should not be now pronounced against him, and he replied that he had none, and no sufficient cause being shown or appearing to the Court, thereupon the Court ren-

dered its judgment, that the said defendant, RALPH JACKSON, having been duly convicted in this Court of the crime of Murder in the Second Degree by his plea of guilty thereto." (Emphasis supplied).

Then follows the judgment of conviction and imprisonment.

After two years and eight months in the state penitentiary the appellant initiated this proceeding and obtained a writ of habeas corpus from the district court in Ada county, alleging that his commitment to the penitentiary was illegal and void on the ground that he did not intelligently and competently waive his right to counsel. Hearing was had, upon the return to the writ, at which appellant testified and presented the testimony of two of his sons, and one Miller, who was confined in the county jail at Grangeville during the time appellant was in that jail awaiting judgment, to the effect that at the time of his arraignment and plea of guilty, appellant did not know what he was doing.

Findings of the district court nos. 11, 12, 13 and 15 are as follows:

"That, thereafter, on the 18th day of March, 1960, petitioner was brought before the said District Court, at chambers, for arraignment and was immediately asked by the Court if he had counsel and upon the petitioner stating that he did not have counsel, he, the petitioner, was asked by the Court if he desired the aid of counsel.

"That, thereupon, and prior to his arraignment in the District Court, petitioner voluntarily, competently and intelligently indicated to the District Court that he had no counsel and did not want the aid of counsel and, at his subsequent arraignment, voluntarily, competently and intelligently plead 'guilty' as charged in the information.

"That the District Court did not, at that time (after the petitioner intelligently and competently indicated to the Court that he had no counsel and did not want the aid of counsel, but before he was arraigned), orally explain to petitioner what constituted an intelligent and competent waiver of the right to the aid of counsel, nor again solicit the intelligent and competent indication of the petitioner on the question of whether or not he wanted the aid of counsel, nor did the District Court then expressly apprise the petitioner of what its authority in the case was or what sentence could or would be pronounced if a conviction were had on a plea of guilty, or otherwise. * * *

"That petitioner herein was competent and capable of understanding and did understand all of the said proceedings and was not coerced, either physically or mentally, into so pleading

'guilty' as charged in the information, or into waiving his right to services of his own or court appointed counsel at all stages of the proceedings."

These findings are supported by the record. The prosecuting attorney further testified:

"Q   At the time of the arraignment of the defendant in chambers in the District Court on March 18, did the defendant appear to comprehend the matters that were being taken care of at that time?

"A   Yes, I felt he could comprehend and understand what was happening.

"Q   Did he appear to be confused?

"A   Not in any way I could notice, I don't think he appeared to be confused.

"Q   Did he seem to have a normal understanding?

"A   Yes.

"Q   In terms generally used by the lay man?

"A   Yes.

"Q   Did he appear to be in shock?

"A   No.

"Q   Could you say he was intoxicated?

"A   No.

"Q   Was he staggering?

"A   No.

"Q   You say he appeared to have full control of all of his faculties?

"A   I would say he appeared to be a man that was very remorseful over what happened, he felt bad, emotionally, I think he was sorry for what had happened, other than this, I think he was in full control of his faculties and knew what was going on."

And on cross-examination:

"Q   Did you make any particular effort to find out if the defendant was capable of understanding?

"A   Well, he appeared capable to me of understanding, I told him—when he told me he wanted to get it over with as fast as possible—he did not have to plead guilty and did not need to plead guilty if he did not want to plead guilty, if he wanted an attorney he was free to get an attorney, his answer simply was, no, I want to get it over with.

"Q   Did you give any thought to this condition of intoxication that you have even testified to yourself as to whether or not it might affect malice aforethought?

"A   I think it was because of what I had seen up at the cabin, the signs of drinking up there and the signs of the struggle and the fact she had been killed with what appeared to be the

broken part of a bottle, it was because of this that I felt it was not premeditated that I could request the judge to reduce it to second degree murder rather than first degree."

Appellant's intelligence and competence is attested by the record of his conduct following his arrest. It was he who first questioned whether the charge should be murder of the first degree and interposed that he had not planned or intended to kill his wife. Thus, through the sheriff and the prosecuting attorney, he sought and obtained a reduction of the charge to murder of the second degree, on the ground that the killing was not "deliberate and premeditated". The record attests that appellant understood the nature and elements of the charge.

Finding no. 13 deals with events transpiring after appellant had been repeatedly advised of his rights and had repeatedly stated that he did not want the advice of counsel, and constitutes a finding that the court did not *"again"* explain to appellant his rights in the premises. Finding no. 13 is not in conflict with the other findings hereinabove set out, because it deals with an entirely different point of time in the course of the arraignment proceedings. The finding is proper, but it does not support appellant's contention that he was not informed of his right to court appointed counsel, and the court, from the record and from its findings correctly concluded that appellant "voluntarily, intelligently and competently waived his right to counsel of his own employment and counsel which could have been appointed by the Court."

As to the suggestion that defendant was not advised as to what penalty might be imposed upon a plea of guilty, we held in Cobas v. Clapp, supra, that he had no such right.

The recent decision of the United States Supreme Court in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, is not in point and has no bearing on the present issue. Gideon did not waive his right to counsel. He requested counsel and his request was denied. Here appellant competently, intelligently, and repeatedly waived his right to counsel.

The record reveals that the sheriff, the prosecuting attorney, the magistrate, and the district judge, all respected and scrupulously observed and protected every statutory and constitutional right of this appellant. If there was haste in the arraignment, it was appellant's haste. The delay of three weeks for entry of judgment was by order of the district judge. When appellant raised a question as to the degree of his crime, that was considered and the charge reduced. It is difficult to see how a better

**284**

record could be made, or fairer treatment accorded an admitted felon.

Judgment affirmed.

KNUDSON, C. J., and McFADDEN and SMITH, JJ., concur.

McQUADE, Justice (dissenting).

The dissent contends that there is no factual basis for the conclusion that appellant intelligently understood his right to court-appointed counsel prior to arraignment and that there is no factual basis for the conclusion that appellant was informed and intelligently comprehended the meaning of his right to court-appointed counsel during the arraignment proceeding. The conclusion must be that appellant's constitutional rights have been abridged and ignored.

In Cobas v. Clapp, 79 Idaho 419, 319 P.2d 475 (1957), the court held, from the following conversation which occurred at arraignment, that the defendant had waived his right to counsel:

" 'The Court: * * * Do you have an attorney to appear for you in this action?

" 'Defendant: No, sir.

" 'The Court: Have you made any effort to obtain an attorney?

" 'Defendant: No.

" 'The Court: Do you desire the aid of an attorney?

" 'Defendant: No.

" 'The Court: You are willing to proceed in this court without the advice of an attorney, are you?

" 'Defendant: Yes.' "

At page 424 of 79 Idaho, at page 477 of 319 P.2d it was stated:

"When appellant was arraigned in the district court he stated specifically that he did not desire counsel, nor was there any showing made that he was unable to employ counsel, nor did he ask the court to appoint counsel for him. The rights afforded appellant under Sec. 19-1512, I.C. on arraignment were in all things complied with. *The right to counsel having been properly waived, the assistance of counsel is no longer a necessary element of the court's jurisdiction.* * * *" (emphasis supplied)

In State v. Thurlow, 85 Idaho 96, 375 P.2d 996 (1962) this court held from the following conversation which occurred at arraignment, that the defendant had not waived his right to counsel:

" 'THE COURT: The defendant, Harold Thurlow, will rise please. You have been charged with the crime of lewd conduct with a child under sixteen

under the name of Harold L. Thurlow. Is that your true name?

" 'MR. THURLOW: Yes sir.

" 'THE COURT: Do you have an attorney?

" 'MR. THURLOW: No.

" 'THE COURT: Do you want an attorney?

" 'MR. THURLOW: No.

" 'THE COURT: You will listen to the reading of the information.
    (Information read by the clerk)

" 'MR. CLERK: To this information what is your plea, guilty or not guilty?

" 'MR. THURLOW: Guilty.

" 'THE COURT: Do you have any recommendations?

" 'MR. KNOWLTON: If the Court please, in this particular case I would move for a pre-sentence investigation.

" 'THE COURT: Be so ordered. (sic) You may be seated.' "

At page 103 of 85 Idaho, at page 1000 of 375 P.2d, it was stated:

"In concluding that defendant herein did not waive his right to counsel we refer to a definition and construction of waiver.

" 'Waiver is defined as the *voluntary relinquishment of a known right. Thus, the accused not only must voluntarily manifest his intention to waive his right or rights but it must clearly appear that he is completely aware of the nature of the charge against him and is competent to know the consequences arising from his waiver of these rights. * * ** '"*
(emphasis supplied)

"Defendant was not advised that he could have counsel appointed for him at the expense of the county if he was unable to pay for such services out of his own assets, if any he had. It appears from the pre-sentence investigation that the defendant had little or no funds and that his credit rating was 'poor.' *It is incumbent upon the court, upon an arraignment for an offense such as is here involved, to ascertain if a defendant is financially capable of hiring counsel and to advise the defendant in order that he may intelligently respond to the court's interrogation upon this subject. Unless informed of these statutory rights it is conceivable that defendant would not know of their existence and his inability to employ counsel would operate to deny him the opportunity to assert defenses to the charge in violation of his right of due process."* (emphasis supplied)

Although Cobas v. Clapp, supra, and State v. Thurlow, supra, may be distinguished procedurally (Cobas arose on habeas corpus while Thurlow arose on

direct appeal), there is nothing to distinguish them factually. Both are vitally concerned with the waiver of the constitutional right to counsel; yet they reach results which are diametrically opposed.

From Federal decisions and a reconsideration by this court in light thereof, it is obvious that the result in Thurlow should prevail. It must be realized we are dealing with a right herein that is protected not only by the Idaho Constitution (Art. 1 § 13) but also by the Sixth Amendment to the Federal Constitution. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). To represent, as does Cobas v. Clapp, supra, that such a right may be waived by a defendant without full knowledge of the scope and meaning of the right denies equal protection to the uninformed indigent. A statement by a defendant that he does not desire counsel may be made under the mistaken belief that since he cannot afford to pay counsel he cannot secure legal representation. In order to insure that an indigent defendant receives the constitutional protection to which he is entitled, it is the obligation of the trial court before arraignment to inform each defendant without counsel of his right to court-appointed counsel, and in each case the court must determine if the defendant has his rights safeguarded.

The majority seem to infer that appellant was informed of his right to court-appointed counsel sometime prior to the arraignment proceedings. In light of State v. Thurlow, supra, that defendant must be informed of his right to court-appointed counsel "upon an arraignment," it seems unnecessary to discuss this contention further. Thus the suppositions of the majority that conversations were held between the prosecutor and the appellant or the sheriff and the appellant or the committing magistrate and the appellant are mere surplusage and immaterial to this appeal. When a defendant appears for arraignment without counsel, the trial judge may not assume that his constitutional rights are being respected. That duty and the responsibility belongs to the trial judge:

"* * * 'The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused —whose life or liberty is at stake— is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.' To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may

tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

"This case graphically illustrates that a mere routine inquiry—the asking of several standard questions followed by the signing of a standard written waiver of counsel—may leave a judge entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel. And this case shows that such routine inquiries may be inadequate although the Constitution 'does not require that under all circumstances counsel be forced upon a defendant.' * * *" Von Moltke v. Gillies, 332 U.S. 708, 723–724, 68 S.Ct. 316, 323, 92 L.Ed. 309, 320–321 (1948).

The order and the minute entry of the trial court in this cause support the position of the majority that appellant was informed of his right to court-appointed counsel. There is, however, direct evidence to the contrary. Confronted with this evidence, the majority has presumed that a conference took place just prior to arraignment between appellant and the trial judge, at which time appellant was thoroughly appraised of his right to court-appointed counsel.

The testimony of the reporter and the prosecutor establishes that such a conference did not take place. The prosecutor testified that he didn't know where the parties were during the time of the presumed conference:

"Q. During this period of time you were typing the matter up in the court reporter's office and using his typewriter, do you know where the defendant was?

"A. In the court room, other than that, I don't know.

"Q. Was the district judge still in the court room?

"A. I believe he was, I don't know that he was there all the time, I don't know."

288

As was noted in the majority opinion, the transcript of the proceedings which were taken by the court reporter are as follows:

"THE COURT: The defendant will stand up. You were charged with the crime of Murder in the First Degree which on motion of the Prosecuting Attorney and order of the Court has been reduced to Murder in the Second Degree under the name of Ralph Jackson. Is that your true name?

"MR. JACKSON: Yes, sir.

"THE COURT: Do you have an attorney?

"MR. JACKSON: No, Sir. No.

"THE COURT: Do you want an attorney?

"MR. JACKSON: No.

"THE COURT: Then you will listen to the reading of the Information.·

(INFORMATION READ BY WAYNE C. MacGREGOR, PROSE-CUTING ATTORNEY)

"THE COURT: To this Information what is your plea, guilty or not guilty?

"MR. JACKSON: Plead guilty.

"THE COURT: The Court in this case, in order to fix sentence, wants a pre-sentence investigation. Certain representations have been made to the Court by the Prosecutor but I would like it reduced to writing for—and a full investigation had. In the meantime you are recommitted to the custody of the sheriff. You may take him.

"THE COURT: You can take the file and prepare an order and also a minute entry."

The court reporter testified that so far as he knew, the above transcript was a full and complete record of all the proceedings that transpired upon the arraignment:

"Q. Mr. Heston, were you present at all times during the proceedings from the moment the defendant was brought before Judge Cramer on, I believe, May 18, until the time he was remanded to the custody of the sheriff?

"A. I could not say that I was, *as far as I know I was,* there possibly might have been some matters gone over in chambers, and there is a possibility that there was some more hearing had in the courtroom, but I don't know, it is just a possibility.

"Q. The judge then only called you in to take down this particular transcript that is now before the court?

"A. Yes, that is all I was present for."

The majority opinion relies upon the minute entry and order of the court in saying that the appellant was informed of his right to court-appointed counsel. Ordinarily we would have no quarrel with this reasoning. However, a presumption must

have some basis in fact. The prosecutor testified that according to his recollection the appellant was never informed of his right to court-appointed counsel:

"Q. Now at any time on May 18, or prior to May 18, do you recall anyone ever advising the defendant if he was without funds the court would appoint an attorney, this was one of his rights?

"A. No, I can't say that I recall that."

The majority suggests that we must presume that the appellant and the trial judge conferred sometime prior to the arraignment. However, the district judge, on the habeas corpus hearing, specifically found:

"*That the District Court did not, at that time* (after the petitioner intelligently and competently indicated to the Court that he had no counsel and did not want the aid of counsel, but *before he was arraigned), orally explain to petitioner what constituted an intelligent and competent waiver of the right to the aid of counsel, * *.*" (emphasis supplied)

To summarize, the only evidence the majority can point to that appellant was informed of his right to court-appointed counsel is the minute entry and order of the court. In the absence of other evidence, the majority relies upon the presumption that the minute entry and order are correct.

However, they can point to no specific reference in the reporter's transcript of the hearing that the defendant was informed and intelligently comprehended his right. To support this "presumption," the majority relies upon an "occurrence" which might have happened, "sometime prior to arraignment." [In other words, appellant's appeal is to be denied because of a presumption based upon a possibility.] In State v. Thurlow, we stated that "Waiver is the voluntary relinquishment of a *known* right." We arrived at the conclusion therein that appellant had not waived his right to counsel as he had not been apprised of his right to have counsel appointed him. As was stated in Davis v. State, Okl.Cr., 368 P.2d 519, at page 520 (1962). " * * * this court will indulge every reasonable presumption against a waiver of fundamental constitutional rights, and will not presume acquiescence in their loss." See also: Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L. Ed.2d 70 (1962), State v. Thurlow, supra, and Von Moltke v. Gillies, supra (there is a "strong presumption against waiver of the constitutional right to counsel"). If we presume knowledge of the right to court-appointed counsel, we are in effect, presuming waiver contra to one of the strongest presumptions known to law.

It is also to be noted that it is an elementary proposition that conclusions of law must be supported by findings of fact. The

district court judge on the habeas corpus hearing concluded in his findings of law that appellant had competently and intelligently waived his right to counsel. However, there is absolutely no finding of fact to support this proposition. Judge Durtschi did not make a factual finding that appellant had been informed of his right to court-appointed counsel. It is true that Judge Durtschi did make a conclusion of law that appellant waived his right to counsel of his own employment and counsel which could have been appointed by the court; however without information of his right to court-appointed counsel it was impossible for appellant to effectuate a waiver (waiver is the voluntary relinquishment of a *known* right).

There are other facts in this case which, although immaterial to this appeal, are worthy of mention. First is the fact that the appellant is a man seriously deficient in his mental capabilities, with a history of alcoholism, a mere eighth grade education, and a low I.Q. Were he to go back to school, he would be placed in the sixth grade (Tr. 42). The assumption of the majority that such a man could be aware of the technical refinements between degrees of murder seems highly improbable. The record does not show appellant made request of the sheriff or the prosecutor to reduce the charge to second degree murder.

The prosecutor's own testimony bears this out:

"I don't believe I personally ever discussed the charge, either of first degree murder or of second degree murder with Mr. Jackson other than I took application down to him to ask him whether this is what he wanted to do, plead guilty, he said he did and wanted to get it over with as fast as he could and asked me whether he could go to Lewiston and stay there, as far as actually discussing the charge, I don't believe he and I ever had any discussion about it." (Tr. 91–92)

The most that can be drawn from the record is that appellant told the sheriff that he didn't mean to kill his wife. This could hardly be construed as conclusive of the fact that appellant was aware of the degrees of the crime of murder.

Secondly, appellant's wife died from a blow on the arm, there were no witnesses, and the record is to the effect that the injuries were inflicted during a "drunken brawl." Appellant seemed perfectly willing to plead guilty to first degree murder and apparently would have done so had not the prosecutor conducted an investigation into the circumstances of the crime *after* the complaint charging the appellant with first degree murder had been filed. (Tr. 93)

Third, on March 16, 1960, the crime was committed. On the same day, appellant

was taken into custody. On March 17th, he was charged with first degree murder and by March 18th, two days after his wife's death, appellant had been convicted of second degree murder. Appellant was never informed of the degrees of the crime of murder; appellant was never told that under the law, he might very well be guilty of a lesser offense than that charged; and from the convicting court's record, no inquiry was made as to the degree of the crime or into mitigating or aggravating circumstances as required by I.C. § 19–2515 and § 19–2516. The majority makes much of the fact that appellant was anxious to "get it over with." It is the duty of our courts to zealously guard the constitutional rights of those accused of serious crimes, and not to negate such rights in the interest of time.

The Constitution states that our district courts are "courts of record." This is a meaningful term. Their proceedings are of such importance as to be worthy of complete and accurate transcription. When a matter of such magnitude as the waiver of an individual's right to counsel is before the court, the proceedings must be carefully and completely recorded so as to insure a reviewing court that due process was afforded the defendant. When such events are not completely reported in open court by record, it may be questioned whether they transpired at all.

The finding in the habeas corpus proceeding leads to the conclusion that appellant did not intelligently understand what a waiver of his right to the aid of counsel meant. The inescapable conclusion is that appellant was denied his right to counsel and therefore the convicting court was without jurisdiction to accept a plea of guilty and thereafter impose sentence.